**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

MARIETA BESERA, on behalf of herself
and of all others similarly situated,

*Plaintiff*,

- against -

GREAT AU PAIR, LLC, MARC HOM,
and MARIE LOUISE HOM,

*Defendants.*

-------------------------------------------------------------x

Docket No. 20-cv-_____

CLASS AND COLLECTIVE
ACTION COMPLAINT
Trial by Jury

     **PLAINTIFF** MARIETA BESERA, by undersigned counsel, on behalf of herself and all others similarly situated, as and for her complaint against Defendants Great Au Pair, LLC, Marc Hom and Marie Louise Hom, alleges as follows:

## PRELIMINARY STATEMENT

     1.    Congress initially created the J-1 visa program to facilitate cultural exchange between nations, but over time, the *au pair* program devolved into a source of cheap, migrant labor. Today, the *au pair* program recruits young, foreign workers, to provide 45-hours of child care per week to American families at a below-market rate.

     2.    The *au pair* program, initially administered by the United States Information Agency ("USIA"), which merged with the State Department in 1999, is managed through fifteen sponsor organizations. The State Department designates these sponsors and charges them with recruiting and placing *au pairs* with American families. Defendant Great Au Pair, LLC is one of these fifteen sponsor organizations.

     3.    Government agencies overseeing sponsors' participation in the J-1 visa program have taken extra steps to protect *au pairs*. While reminding sponsors that *au pairs*, like other

1

employees, are fully protected by labor laws, including federal minimum wage laws, the government added yet another safeguard – an absolute programmatic wage floor that the sponsors were required to verify with the host families. This additional layer of protection would at least cause sponsors to recognize that what they euphemistically called "pocket money" or "stipend" was actually a wage, subject to Fair Labor Standards Act and state labor laws. The State Department website specifically advises J-1 visa holders, like *au pairs,* of their right to federal minimum wage at $7.25 per hour and to "check [t]he minimum wage for the state in which you work. If that wage is higher, you have the right to be paid the higher amount."

4.      Unfortunately, the *au pair* sponsors, including Defendant Great Au Pair, LLC, turned the government's effort to protect *au pairs* on its head. They agreed among themselves that, with few exceptions, each sponsor would place *au* pairs with host families at a wage pegged to the programmatic wage floor, and no greater.

5.      Thus, several *au pairs* filed a class action suit in the District Court of Colorado, in <u>*Beltran et al. v. Interexchange, Inc., et al.*</u> (14-cv-03074-CMA-KMT), whereby they alleged, among others, that Defendants therein, including Defendant Great Au Pair, LLC herein, engaged in restraint of trade in violation of 15 U.S.C. §§ 1 *et seq*. by collectively controlling the market for J-1 visa *au pair* employment and conspiring to fix standard *au pair* wages at exactly the programmatic wage floor, which was (still is) $195.75 per week, despite its illegality and differences in market conditions.

6.      Upon information and belief, the parties in the <u>*Beltran*</u> matter entered into a $65.5 million settlement in January 2019.

7.      In another federal case involving *au pairs* (<u>*Capron v. Office of the Attorney General of the Commonwealth of Massachusetts,*</u> 16-cv-11777-IT [D. Mass., Aug. 1, 2017]), the

District Court of Massachusetts dismissed the complaint filed by J-1 *au pair* host families and a private placement agency who sought injunctive and declaratory relief, contending that the *Au Pair* Program impliedly preempted Massachusetts from requiring host families to comply with its wage and hour laws as employers of the J-1 visa holders who provided them childcare services through that program. On December 2, 2019, the First Circuit Court of Appeals (*Capron v. Office of the Attorney General of the Commonwealth of Massachusetts*, 17-2140) affirmed the District Court's ruling. The U.S. Supreme Court, on June 22, 2020, denied the petition for a writ of certiorari (No. 19-1031). Thus, the prevailing jurisprudence on J-1 employment is that state worker-protection laws are not preempted by federal law and regulations governing the *au pair* program.

## NATURE OF THE ACTION

8.      In this action, the named Plaintiff and those similarly situated seek damages and other relief from Defendant Great Au Pair, LLC for violating the minimum and overtime wage provisions under the Fair Labor Standards Act ("FLSA") and the New York Labor Law.

9.      Additionally, Plaintiff seeks damages against her host family, herein Defendants Hom, in their capacity as her joint employers.

10.     Plaintiff likewise asserts a claim under the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §1589 and 18 U.S.C. §1590) to recover compensatory and punitive damages arising from Defendants' unlawful conduct of forced labor.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 29 U.S.C. §§ 201 *et seq.* (Fair Labor Standards Act, "FLSA"), and 18 U.S.C. §1589 and 18 U.S.C. §1590 *et seq.* (Trafficking Victims Protection Reauthorization Act, "TVPRA" of

2003, amending the Trafficking Victims Protection Act, "TVPA"), in that these claims are asserted under the laws of the United States.

12.    This Court has supplemental jurisdiction over the related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. §1367.  Supplemental jurisdiction over those claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claim arises.

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.

<u>**PARTIES**</u>

14.    Plaintiff Marieta Besera ("Besera" or "Plaintiff") is an adult female Filipino national presently residing in Hudson County, state of New Jersey.

15.    Defendant Great Au Pair, LLC ("Defendant Sponsor") is, upon information and belief, a limited liability company with business address at 6836 Bee Caves Road, Suite 222, Austin, TX 78746.

16.    Upon information and belief, Defendant Sponsor is an accredited organization by the U.S. Department of State to sponsor, recruit, and place foreign *au pairs* with American families under the J-1 visa program.

17.    At all relevant times, and upon information and belief, Defendant Sponsor transacted business communications and negotiated agreements from their offices in Texas and elsewhere with their clients and/or employees, utilizing in the process the postal service or other courier delivery service, the phone, fax, and/or email communications systems that moved along interstate boundaries, including to addresses within the state of New York.

4

18.     Upon information and belief, at all relevant times, Defendant Sponsor regularly communicated with their employees, including with herein Plaintiff, through phone, text, fax and/or email service systems. From their offices in Texas or elsewhere, Defendant Sponsor gave instructions to its recruits and employees with regard to their immigration sponsorship issues and employment-related concerns, while the employees were in the state of New York.

19.     Defendant Sponsor, through its agents/representatives and Regional Manager, communicated with Plaintiff, during all times relevant, either through phone, text, and/or email communications, and gave instructions to Plaintiff regarding Plaintiff's immigration sponsorship issues and employment-related concerns, including when the Plaintiff was working in Brooklyn, within the state of New York and this District.

20.     Upon information and belief, Defendant Sponsor, through its agents/representatives and Regional Manager, communicated with Defendant Spouses, during all times relevant, either through phone, text, and/or email communications, and gave advice and instructions to Defendant Spouses regarding Plaintiff's immigration sponsorship issues and employment-related concerns, including when either or both the Defendant Spouses were residing in Brooklyn, within the state of New York and this District.

21.     Upon information and belief, at all relevant times, Defendant Sponsor engaged in acts that had effects in New York, such as when it exchanged communications with Plaintiff and/or with Defendant Spouses while they were residing and/or working in New York.

22.     Defendant Marc Hom ("Defendant Host Dad") is an adult male individual who resides, upon information and belief, at 82 Willow Street, Apt. 2, Brooklyn, NY 11201, within this District.

23.     Defendant Marie Louise Hom ("Defendant Host Mom") is an adult female individual who resides, upon information and belief, at 82 Willow Street, Apt. 2, Brooklyn, NY 11201, within this District.

24.     Upon information and belief, the Defendant Host Dad and the Defendant Host Mom are married to each other. Together, they shall be referred to herein also as "Defendant Spouses".

25.     At all times relevant to this action, each Defendant was an "employer" of the Plaintiff within the meaning of the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL).

26.     At all times relevant to this action, Plaintiff was an "employee" of each Defendant within the meaning of the Fair Labor Standards Act and the New York Labor Law.

27.     Upon information and belief, Defendant Sponsor employs or employed more than four (4) workers who fall under the category of "non-exempt employees" pursuant to the FLSA, and these employees regularly and recurrently either engaged in commerce or handled or otherwise worked on goods or materials that had been moved in or produced for commerce, such as when they handled credit card transactions or when they accepted delivery of supplies ordered from out-of-state.

28.     Upon information and belief, Defendants had power over personnel decisions involving the Plaintiff.

29.     Upon information and belief, Defendants had power over payroll decisions over the Plaintiff.

30.     Upon information and belief, Defendants had the power to hire and fire the Plaintiff, establish and pay her wages, set her work schedules and maintain her employment records, and they acted jointly with respect to the wage practices pertinent to the Plaintiff.

31.     At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" because they utilized essential business equipment, such as computers and telephones, and used cleaning equipment and other supplies that, upon information and belief, were manufactured outside the state of New York or Texas, and were moved in interstate commerce.

32.     Upon information and belief, Defendants regularly earned more than $500,000 in annual gross revenues, at all times relevant.

33.     At all relevant times, the work performed by Plaintiff was directly essential to the business/es operated by the Defendants.

34.     Defendant Sponsor and Defendant Spouses are associated in fact and comprise a venture as that term is used in the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 and 1595.

## STATEMENT OF FACTS

35.     Sometime in June 2017, Plaintiff's cousin "Lisa", who was, upon information and belief, at that time being matched by Defendant Sponsor with the Defendant Spouses, introduced Plaintiff to the Defendant Spouses and recommended that Defendant Spouses instead secure Plaintiff's services, and not hers, for the J-1 visa program.

36.     Sometime thereafter, also in June 2017, the Defendant Spouses interviewed Plaintiff over the phone for the *au pair* position. At that time, Plaintiff was in Sweden, and the Defendant Spouses were in the United States. After the interview, the Defendant Spouses

advised Plaintiff to connect with Defendant Sponsor so that Plaintiff's immigration papers could be processed.

37.    Sometime in July 2017, Plaintiff was interviewed by an agent or representative of Defendant Sponsor in Copenhagen, Denmark.

38.    In exchange for the J-1 visa sponsorship, Plaintiff paid Defendant Sponsor, through its agents, the total amount of $600.

39.    From July 13, 2017 through the second week of August 2017, Defendant Spouses required Plaintiff to go to and render services for their family in Denmark as and by way of work-trial. The Defendant Spouses were originally from Denmark and they spent part of the 2017 summer there during this work-trial period.

40.    Upon information and belief, while Plaintiff was rendering services during the work-trial period, Defendant Spouses and Defendant Sponsor had begun processing the J-1 visa sponsorship papers for the Plaintiff.

41.    On or about August 23, 2017, Defendant Sponsor instructed Defendant Spouses and the Plaintiff to sign a Host Family – *Au Pair* Agreement, which the parties did sign. The Agreement contained the following provisions:

   a)    *Au pair* is not to provide more than 45 hours of childcare services per week, including hours when the *au pair* is caring for sleeping children;

   b)    *Au pair* is not to provide more than 10 hours of childcare on any given day, including hours when the *au pair* is caring for sleeping children;

   c)    *Au pair* is to receive a minimum of one and a half days off per week, in addition to one weekend (Friday evening to Monday morning) off each month;

   d)    *Au pair* is to receive two weeks of paid vacation during his/her stay in the United States;

e)     Regardless of the number of hours of childcare provided, the *au pair* is to receive the weekly stipend as agreed between Great AuPair, the host family, and the *au pair* for the category of the *au pair* selected, which shall never be less than $195.75 as stipulated by regulations governing the *au pair* program;

f)     The host family agrees to facilitate enrolment and transportation for the *au pair* at a U.S. post secondary institution and will be responsible for covering the cost of tuition up to a maximum of $500 per year.

42.     Upon information and belief, on or about September 19, 2017, a responsible officer of Defendant Sponsor signed and submitted the requisite DS-2019 Certificate of Eligibility for Exchange Visitor Status Form to the U.S. Department of State.

43.     On October 10, 2017, Plaintiff secured her J-1 visa from the U.S. Embassy in Manila, Philippines through the Defendant Sponsor's sponsorship.

44.     After informing Defendant Sponsor that she had secured her J-1 visa, the Defendant Sponsor required Plaintiff to undergo an online childcare training, which she did.

45.     Plaintiff arrived in New York City with her J-1 visa on October 25, 2017.

46.     Plaintiff immediately reported to her host family, that is, the Defendant Spouses' family, at their Brooklyn residence.

47.     The Defendant Spouses had two minor male children: Child A, who was 7 years old at that time, and Child W, who was 4 years old. They were the children whom Plaintiff was supposed to take care of in her role as an *au pair*.

48.     A few weeks after Plaintiff reported to work at the Defendant Spouses' apartment, Defendant Sponsor's local childcare coordinator (Gayle Naftaly) went to the Brooklyn apartment and checked on Plaintiff's situation. She confirmed with Plaintiff the nature of duties and responsibilities that Plaintiff as a J-1 *au pair* was supposed to perform.

49.     As an *au pair*, Plaintiff's responsibilities were supposed to be childcare services only.

50.     However, the Defendant Spouses required Plaintiff to render more than childcare services, thus effectively removing her outside the parameters of the J-1 program. Plaintiff performed services as a domestic housekeeper.

51.     Throughout her employment with Defendants Host Dad and Host Mom, Plaintiff regularly worked more than forty five (45) hours per week at their Brooklyn residence, where she provided various services, including, but not limited to: setting up the table for breakfast; preparing breakfast for the two children; preparing lunch box for Child W; attending to the children while they were having breakfast; helping Child W with his clothes; attending to both children while they brushed their teeth; giving Child A his medicine; dropping both or at least one child off for school; bringing the dog out in the mornings; cleaning the breakfast table; putting the dishes in the dishwasher; cleaning the kitchen; making up the beds of both children and also of the Host Dad and Host Mom; on Mondays, regularly washing the clothes and bed sheets of both children and of the Host Dad and Mom, and changing the bed sheets; on Tuesdays, regularly doing the ironing of the clothes and of the bed sheets of the children and of the Host Dad and Mom; cleaning the bedrooms as well as the Defendant Spouses' toilet and bathroom; vacuuming and wiping the surfaces and corners of the rooms; cleaning the living room, dining room and the hallway; vacuuming and cleaning the toilets and mopping the floors; deep cleaning with hot water and soap certain house furniture and paraphernalia, such as the candle holder; taking the dog out for a walk in the middle of the day; picking both or at least one of the children after their school hours, and then bringing them to after-school activities or play dates; setting up the dining table and making dinner; preparing the children's bath; sometimes

giving bath to the children; cleaning the dining table; cleaning up the kitchen, and; throwing out the garbage.

52.     During her first year as an *au pair* doing domestic housekeeping chores for the Defendant Spouses' family, Plaintiff regularly and consistently started her work-day every day at 7 o'clock in the morning, and ended her day around 9 o'clock at night. She barely had a few minutes of lunch break due to the myriad responsibilities and duties she was required and expected to do.

53.     During her first year as an *au pair* doing domestic housekeeping chores for the Defendant Spouses' family, Plaintiff did not have a regular day off, as she was required to work straight days. Every now and then however, she was given a whole week-end off from Friday night to Sunday night. Even then, these were far and in-between, and were not in compliance with the Agreement that they had signed.

54.     Whenever the Defendant Spouses invited friends or family members to stay with them, Plaintiff also had to take care of their needs and to serve them, as if she were their waitress.

55.     Defendant Spouses required Plaintiff to work more than forty five (45) hours per week, and Plaintiff regularly and consistently worked, during the first year of her employment, between seventy two (72) and seventy five (75) hours per week.

56.     During all these times, Defendant Spouses paid Plaintiff only two hundred dollars ($200) a week in cash. Sometimes, the payments were even late.

57.     Although Plaintiff understood that she was doing more work than that legally required of an *au pair*, she did not initially complain as she just wanted to show her debt of

gratitude to the Defendant Spouses for sponsoring her and for giving her the opportunity to come to the United States.

58.     On the last day of April 2018, Defendant Host Mom required Plaintiff to clean the porch at the back of the kitchen and the stone floors at the small backyard in preparation for her birthday party.

59.     Sometime last week of May 2018, Defendant Host Mom again required Plaintiff to clean the porch at the back of the kitchen and stone floors at the small backyard, so that the place could be used, this time for Child A's birthday party.

60.     Sometime in June 2018, Plaintiff informed the Defendant Spouses that she was not planning on extending her J-1 *au pair* status with them, and that she would be looking for a rematch with a different host family.

61.     When asked by Defendant Spouses why she would not want to extend, Plaintiff replied that she was being required to clean the porch, being required to do the ironing, being given no break time, and being required to work straight for 12 hours and longer, especially if Defendant Spouses had guests, or when she needed to do the babysitting when the Defendant Spouses would go out at night.

62.     Defendant Host Mom explained to the Plaintiff that from thereon she would be given at least one and a half hours of break during the day and would be given a regular day off every week. She also told Plaintiff that she would not know what to tell the children, especially Child W who had become so close to the Plaintiff, if the Plaintiff would not extend her J-1 employment with them.

63.     Thinking of the welfare of Child W, Plaintiff reluctantly agreed to have her J-1 status extended with the Defendant Spouses' family.

64.     On or about July 3, 2018, a responsible officer of Defendant Sponsor signed and submitted DS-2019 Certificate of Eligibility for Exchange Visitor Status in order to extend the J-1 *au pair* status of the Plaintiff from October 25, 2018 through October 25, 2019.

65.     True enough, after their June 2018 discussion, Defendant Spouses gave Plaintiff one and a half hours of break every work day and also gave her a regular day off during the week.

66.     However, Defendant Spouses still required Plaintiff to do duties outside of childcare services, such as doing the ironing and heavy cleaning around the apartment.  They continued to require Plaintiff to render domestic housekeeping chores.

67.     Starting in or about July 2018, Plaintiff consistently worked an average of between 60 and 65 hours per week.

68.     Sometime in January 2019, Defendant Spouses instructed Plaintiff to clean, not just the door hinges and the bathroom walls, but also the airconditioning ventilation unit, which necessitated Plaintiff to use a step ladder to be able to clean it.

69.     While Plaintiff was cleaning the airconditioning ventilation unit, the step ladder became wobbly, and Plaintiff felt afraid that she would fall. She cried while she was at the top of the step ladder, and thought that the extra duties and risks she was required to do were not worth the $200 dollars she was receiving every week.

70.     Sometime in February 2019, Plaintiff complained to a representative of Defendant Sponsor about the number of her work-hours and the nature of her job responsibilities she was being required to do, and she expressed her desire to do a rematch, which meant, that she would be requesting Defendant Sponsor to find her a different host family for the remainder of her J-1 status (which would end on October 25, 2019).

71.    Defendant Sponsor's representative somehow managed to calm down Plaintiff and convinced her to endure her complaints and to continue working for the Defendant Spouses.

72.    Sometime in April 2019, Plaintiff demanded from Defendant Host Mom that she be paid her two weeks vacation pay.

73.    Defendant Host Mom responded by stating that Plaintiff had only one week vacation pay left, as Plaintiff had allegedly already used one week of paid vacation in December 2018 when the Defendant Spouses' family went to Denmark and Plaintiff was left alone in Brooklyn.

74.    Plaintiff replied that when she was left behind in Brooklyn in December 2018, she was not actually on vacation as she still had to bring the dog out every day for a walk and she made sure that the dog was properly cared for.

75.    Plaintiff decided at that time that it was really time for her to get a rematch and to find another host family for the remainder of her J-1 status.

76.    Plaintiff informed Defendant Host Mom about her decision to get a rematch.

77.    Sometime thereafter, or on or about April 17, 2019, Defendant Host Mom and Plaintiff sat down to discuss Plaintiff's decision to get a rematch. Defendant Host Mom requested Plaintiff not to get a rematch until after July 11, 2019, because they were allegedly going to schedule Child A for hospitalization sometime around before that date, and that they needed Plaintiff during this time.

78.    Plaintiff responded that she could stay only until end of May 2019, as the prospect family interested in getting her as an *au pair* during the remainder of her J-1 status would be willing to sponsor her only if she worked for them for at least six months.

79.    Defendant Host Mom inquired what Plaintiff would do if she did not get a rematch during the two-week period normally given to find a rematch. Plaintiff responded that she would more likely just go back to the Philippines as she no longer wanted to work for them, considering the nature of her duties, the number of her work-hours and the amount of her wages, which were all not in compliance with the J-1 program regulations.

80.    At that point, Defendant Host Mom expressed her anger, got upset, and told Plaintiff that if Plaintiff insisted on getting a rematch, Plaintiff should be prepared to go home to the Philippines in two-weeks' time as she (Defendant Host Mom) would tell Defendant Sponsor's Regional Manager (Stephanie Francois) to make sure that Plaintiff did not get a rematch and would have to leave in two weeks' time, and that they (Defendant Spouses) would never give any recommendation on Plaintiff's behalf to other families desiring to secure her services as an *au pair*.

81.    After her discussion with Defendant Host Mom, Plaintiff exchanged email communications with Defendant Sponsor's Regional Manager regarding her complaints.

82.    Upon information and belief, Defendant Sponsor's Regional Manager likewise exchanged communications with Defendant Host Mom regarding Plaintiff's complaints and Defendant Host Mom's insistence that Plaintiff not be given any opportunity to do a rematch.

83.    On the following day, Defendant Sponsor's Regional Manager called up and teleconferenced with both Defendant Host Mom and Plaintiff while they were in Brooklyn.

84.    Plaintiff explained to Defendant Sponsor's Regional Manager why she wanted to get a rematch and not to continue working anymore for the Defendant Spouses' family. She mentioned the length of her break-time (which was not enough), the nature of her duties which included doing non-childcare services, such as washing and ironing clothes and bed sheets of the

Defendant Spouses and doing heavy cleaning around the apartment, and even having to climb on a step ladder to be able to clean certain parts of the apartment. She complained that her weekly stipend of $200 was worth so less for the total number of work-hours she devoted to the Defendant Spouses' family.

85.     Upon information and belief, Defendant Host Mom had already discussed with Defendant Sponsor's Regional Manager because the Regional Manager told Plaintiff that she would not make a rematch for Plaintiff, and that if Plaintiff insisted on getting a rematch, that Plaintiff should instead prepare to go home to the Philippines in two-weeks' time.

86.     Plaintiff cried as she was clearly made to understand by Defendant Sponsor's Regional Manager that she was actually given no choice but to continue working for Defendant Spouses' family. Plaintiff did not want to go back to the Philippines yet, as she was hoping she could get a rematch to work for a different host family for the remainder of her J-1 status. Plaintiff clearly understood Defendants' threat that if she did not continue working for Defendant Spouses, Defendant Sponsor would cancel her J-1 sponsorship or preterminate her J-1 immigration status.

87.     With a heavy heart, Plaintiff informed Defendant Host Mom and Defendant Sponsor's Regional Manager that she would continue working for Defendant Spouses' family.

88.     Defendant Sponsor's Regional Manager responded by saying that she would separately discuss with Defendant Host Mom about her (Plaintiff's) work-hours and the nature of her duties and responsibilities.

89.     Plaintiff knew, and even Defendant Sponsor's Regional Manager knew or had been informed, that Plaintiff had a valid reason not to continue working for Defendant Spouses' family and had every right to be given the opportunity to find a rematch, but that Defendant

Sponsor simply showed its bias in favor of the host family by accommodating their request to reject Plaintiff's demand for a rematch.

90.     Upon information and belief, Defendants conspired with one another to ensure that Plaintiff would not be given an opportunity to make a rematch, which was her lawful right to demand, and so that Plaintiff would continue working for the Defendant Spouses.

91.     Upon information and belief, Defendants abused the J-1 immigration sponsorship process so that Plaintiff would continue working for Defendant Spouses despite her valid complaints.

92.     Defendants threatened Plaintiff with the abrupt termination of her J-1 status so that she would continue working for Defendant Spouses.

93.     Thus, Plaintiff was constrained under the circumstances to continue providing services for the Defendant Spouses' family.

94.     Upon information and belief, Defendant Sponsor's Regional Manager exchanged further communications with Defendant Host Mom after the teleconference to address some of Plaintiff's employment concerns and issues.

95.     Defendant Sponsor's Regional Manager likewise exchanged further communications with the Plaintiff, seemingly giving the impression that she would still help Plaintiff find another host family, but she knew that at that time, it was already very difficult, if not impossible, to find another host family to accept and sponsor Plaintiff considering the number of months left in Plaintiff's J-1 status.

96.     After the April 2019 teleconference, Defendant Spouses extended Plaintiff's break-time from one and a half hours to three hours each work-day.

97.    After the April 2019 teleconference, Defendant Spouses no longer required Plaintiff to clean parts of the apartment which necessitated the use of a step ladder.

98.    After the April 2019 teleconference, Defendant Spouses still required Plaintiff to render non-childcare services, such as washing and ironing the clothes and bed sheets of the Defendant Spouses and to do heavy cleaning around the apartment. Defendants continued to require Plaintiff to render and perform domestic housekeeping chores.

99.    After the April 2019 teleconference, Defendant Spouses required Plaintiff to consistently render services at an average of about 50 hours per week, until Plaintiff left her employment.

100.    After the April 2019 teleconference, Defendant Spouses still continued to pay Plaintiff two hundred dollars ($200) per week in cash, until Plaintiff left her employment.

101.    As stated above, Defendants regularly suffered or required Plaintiff to work as their domestic live-in housekeeper in excess of forty (40) hours per week during the period of her employment, from October 25, 2017 through November 1, 2019.

102.    Although Plaintiff worked more than forty (40) hours each workweek, Defendants did not pay her any compensation for the extra hours beyond forty (40) each workweek.

103.    Although Plaintiff worked more than forty four (44) hours each workweek, Defendants did not pay her time and a half for the extra hours beyond forty four (44) each workweek.

104.    Defendants did not compensate Plaintiff at the federal or NYLL statutorily-required rate of one and one-half times her regular rate of pay, for any and all hours that Plaintiff worked per week in excess of forty (40) or forty four (44) hours.

105.    Although the Plaintiff regularly worked in excess of ten (10) hours per day, Defendants did not pay Plaintiff one additional hour of pay at the basic minimum hourly rate for all of the times that the length of the interval between the beginning and end of her workday - including working time plus time off for meals plus intervals off duty - was greater than 10 hours.

106.    Upon information and belief, Defendants did not keep accurate records of wages or of hours worked by the Plaintiff.

107.    Defendants did not furnish Plaintiff with a wage statement that accurately listed the following:  the dates of work covered by the payment; Plaintiff's name; Employers' names; Employers' address and telephone number; Plaintiff's hourly rate of pay; Plaintiff's overtime rate of pay; and the basis for computing Plaintiff's rate of pay.

108.    Defendants intentionally did not provide Plaintiff with a wage notice at the time of hire containing all of the following information:  Plaintiff's hourly rate of pay; Plaintiff's overtime rate of pay; whether any allowances are claimed as part of the minimum wage; the regular rate of pay designated by the Employers; the name and physical address of the Employers; any "doing business as" names used by the Employers; and Employers' mailing address and telephone number(s).

109.    Defendants were also at all times aware of their legal obligations to pay Plaintiff for all hours of work over forty (4) per workweek, and to pay Plaintiff overtime pay at the rate of one and one-half times her regular rate of pay for hours worked per week in excess of forty four (44), under the FLSA and the NYLL.  In addition, Defendants were aware of their legal obligation to issue Plaintiff accurate wage statements on each payday and an initial wage notice

in accordance with the NYLL.  Thus, their violations of the FLSA and the NYLL with respect to the Plaintiff were willful.

110.    Plaintiff ended her employment with the Defendant Spouses' family as their domestic housekeeper on or about November 1, 2019.

111.    During the collective and class periods, and at all relevant times herein, upon information and belief, Defendant Sponsor likewise recruited, placed and/or employed other individuals similarly situated to and like the Plaintiff who also worked in excess of 40 hours per week, but were not compensated for all of their hours of work and/or were compensated an amount that was less than one and a half times their regular hourly rate, in violation of the FLSA and the state labor law.

## COLLECTIVE ACTION ALLEGATIONS

112.    Pursuant to 29 U.S.C. §207, Plaintiff Besera seeks to prosecute her FLSA claim as a collective action on behalf of all persons who are or were formerly recruited, placed and/or employed by Defendant Sponsor at any time since August 18, 2017 (or three years prior to the filing of this Complaint) to the entry of judgment in this case (the "Collective Action Period"), as weekly paid *au pairs*, and who were not compensated for all hours worked in excess of forty (40) hours per workweek (the "FLSA Collective").

113.    All of the work that Plaintiff and the FLSA Collective have performed has been assigned by the Defendant Sponsor, and/or the Defendant Sponsor has been aware of or should have known of all of the work that Plaintiff and the FLSA Collective have performed.

114.    As part of their regular business practice, Defendant Sponsor has intentionally, willfully, and repeatedly engaged in a pattern, practice and/or policy of violating the FLSA with

respect to the Plaintiff and the FLSA Collective.  This policy and pattern or practice includes, but is not limited to:

    a.    willfully failing to pay Plaintiff and the members of the FLSA Collective regular minimum wage compensation rate for all hours actually worked in excess of 40 hours per workweek, and;

    b.    willfully misclassifying Plaintiff and the members of the FLSA Collective as exempt from the protections of the FLSA.

115.    Defendant Sponsor is aware or should have been aware that federal law required it to pay its *au pair* employees, including the Plaintiff and the members of the FLSA Collective, in the amount of at least their regular minimum wage compensation for all hours worked in excess of 40 hours per workweek.

116.    Plaintiff and the FLSA Collective are or were paid on a weekly basis, and perform or performed the same primary duty as *au pairs*.

117.    Plaintiff and the FLSA Collective are or were not paid at least their regular minimum wage compensation for hours worked in excess of forty (40) per workweek.

118.    Defendants' unlawful conduct has been widespread, repeated, and consistent.

119.    The number of the FLSA Collective is so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within the sole control of the Defendant Sponsor, upon information and belief, there are more than 100 members of the FLSA Collective during the Collective Action Period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, and/or knowledge of their claims, and are fearful of retaliation.

120.    Questions of law and fact common to the members of the collective action predominate over questions that may affect only individual members because Defendant Sponsor has acted on grounds generally applicable to all members.

121.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a collective action.

## CLASS ALLEGATIONS

122.    Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

123.    Plaintiff brings her relevant State Labor Law claim on behalf of all persons who were or are recruited, placed and/or employed by Defendant Sponsor at any time since August 18, 2014 (or six years prior to the filing of this Complaint), to the entry of judgment in this case (the "Class Period"), as weekly-paid *au pairs*, and have not been paid for all of the time that they actually worked, and/or were not compensated at all, including overtime wages, in violation of the relevant State Labor Law (the "Class").

124.    Excluded from the Class are Defendant Sponsor, Defendant's legal representatives, officers, directors, assigns and successors, and/or any individual who has, or who at any time during the class period has had, a controlling interest in Defendant; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from each Class.

125.    The persons in the Class identified above are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within the sole control of the Defendant, upon information and belief, there are approximately more than 100 members of the

Class during the relevant Class Action Period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, and/or knowledge of their claims, and are fearful of retaliation.

126.    Common questions of law and fact exist as to the Class that predominate over any questions only affecting them individually, and these include, but are not limited to the following:

a.    whether Defendant Sponsor violated the relevant state labor law, for not compensating Plaintiff and the Class members for all of their hours worked, including relevant overtime work-hours per workweek;

b.    whether Defendant's practice and/or policy of not paying weekly-paid *au pairs* for all hours worked, including for overtime hours, was instituted willfully or with reckless disregard of the law; and

c.    the nature and extent of class-wide injury and the measure of damages for those injuries.

127.    The claims of Plaintiff are typical of the claims of the Class she seeks to represent.  Plaintiff and all members of the Class work or have worked for Defendant as weekly-paid *au pairs*. Plaintiff and the members of the Class enjoy the same statutory rights under the relevant state labor laws, to be paid wages for all hours worked, including overtime wages. Plaintiff and members of the Class have all sustained similar types of damages as a result of Defendant's failure to comply with the relevant state labor laws. Plaintiff and the members of the Class have all been injured in that they have been uncompensated or under-compensated due to Defendant's policy, practice and pattern of conduct.

128.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.   Plaintiff understands that as a class representative, she assumes a fiduciary responsibility to the Class to represent its interests fairly and adequately.   Plaintiff recognizes that as a class representative, she must represent and consider the interests of the Class just as she would represent and consider her own interests.   Plaintiff understands that in decisions regarding the conduct of the litigation and its possible settlement, she must not favor her own interests over the interests of the Class.   Plaintiff recognizes that any resolution of the class action must be in the best interest of the Class.   Plaintiff understands that in order to provide adequate representation, she must be informed of developments in litigation, cooperate with class counsel, and testify at deposition and/or trial.   Plaintiff has retained counsel competent and experienced in low wage-employment litigation and class actions.   There is no conflict between Plaintiff and the members of the Class.

129.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the contexts of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.   In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

130.    This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(3).

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act (FLSA)**
**(Brought on behalf of Plaintiff and the FLSA Collective against Defendant Sponsor)**

131.    Plaintiff, on behalf of herself and the FLSA Collective, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

132.    Defendant Sponsor has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

133.    At all relevant times, Plaintiff and other similarly-situated current and former employees of Defendant were engaged in commerce and/or the production of goods for commerce, within the meaning of 29 U.S.C. §§206(a) and 207(a).

134.    At all times relevant, Plaintiff engaged in "commerce" while working for the Defendant, as when she regularly used cleaning and washing equipment and supplies which were ordered and/or manufactured, upon information and belief, outside the state or delivered crossing state lines.

135.    At all relevant times, Plaintiff and members of the FLSA Collective are/were employees within the meaning of 29 U.S.C. §§203(e) and 207(a).

136.    At all relevant times, Defendant had been and continues to be, an employer engaged in interstate commerce and/or the production of goods for commerce, within the meaning of  29 U.S.C. §§206(a) and 207(a).

137.    Upon information and belief, based on the nature of operations of Defendant Sponsor, which included recruiting workers from foreign countries, transporting them to the United States, training them, employing them, and monitoring them, at all relevant times, Defendant Sponsor employs or employed more than four (4) workers who fall under the category of "non-exempt employees" pursuant to the FLSA, and these employees regularly and recurrently either engaged in commerce or handled or otherwise worked on goods or materials that had been moved in or produced for commerce, including computers and telephones, and

such as when they handled credit card transactions or when they accepted delivery of supplies ordered from out-of-state.

138.    At all relevant times, Defendant was and continues to be an "enterprise engaged in commerce" because it utilized essential business equipment, such as computers, printers and office supplies that, upon information and belief, were manufactured outside the state of Texas and were moved in interstate commerce.

139.    Upon information and belief, at all relevant times, Defendant Sponsor regularly used, sourced out and ordered its computer equipment and supplies by ordering either through the telephone or through online, with supply and distribution companies, and which various equipment and supplies, upon information and belief, were either manufactured outside the state of Texas or were delivered crossing state lines.

140.    At all relevant times, Defendant's business activities are/were related, and performed through unified operations or common control for a common business purpose, and constitute/constituted an enterprise within the meaning of 29 U.S.C. §§203(r).

141.    At all relevant times herein, upon information and belief, Defendant's business and enterprise have/had annual gross revenues in excess of $500,000.00 (five hundred thousand dollars).

142.    At all relevant times herein, Defendant Sponsor suffered and permitted Plaintiff and the members of the FLSA Collective to work because it controlled their recruitment, had the ability to terminate participation in the J-1 program, trained them, maintained their records, controlled where they worked and the dates of their employment, set the terms of their employment, and set their wage rates.

143.    At all relevant times herein, Defendant Sponsor employed and/or continues to employ the Plaintiff and the members of the FLSA Collective in various host families, in furtherance of the activities of its enterprise, and while engaged in commerce and/or continuing to engage in commerce.

144.    The minimum wage provisions set forth in 29 U.S.C. §§201 *et seq.* apply to Defendant Sponsor.

145.    At all relevant times, Defendant Sponsor had or has a policy and/or practice of refusing to pay regular minimum compensation for all worked hours, including those hours in excess of forty (40) hours per workweek, to its *au pair* employees.

146.    Defendant's violations of the FLSA, as described in this Complaint, have been willful and intentional.  Defendant has failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly-situated current and former employees.

147.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. §255.

148.    As a result of Defendant's willful failure to compensate its employees, including Plaintiff and the FLSA Collective, for all of the hours actually worked by them, including those in excess of forty (40) hour per workweek, at their regular rate, the Defendant violated and continues to violate the FLSA, 29 U.S.C. §201 *et seq.*, including 29 U.S.C. §207(a)(1) and 215(a).

149.    As a result of Defendant's failure to properly compensate its employees, including Plaintiff and the FLSA Collective, the Defendant failed to make, keep, record, credit them with actual work hours, and to preserve records with respect to each of its employees, sufficient to

determine the wages, hours and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. §201 *et seq.*, including 29 U.S.C. §211(c) and 215(a).

150.    Due to Defendant's FLSA violations, Plaintiff and the members of the FLSA Collective suffered damages by being denied proper regular compensation for all their hours of work, including those hours in excess of 40 hours per workweek.

151.    Due to Defendant's FLSA violations, Plaintiff and the members of the FLSA Collective are entitled to recover from the Defendant, the unpaid regular compensation for all their hours worked, including for those hours worked in excess of forty (40) hours per workweek, as well as additional amount equal to the unpaid compensation as and by way of liquidated damages, an additional liquidated damages for unreasonably delayed payment of wages, reasonable attorney's fees, and costs and disbursements of this action, pursuant to 29 U.S.C. §216(b).

### SECOND CAUSE OF ACTION
**Non-Payment of Minimum and Overtime Pay under the Relevant State Labor Law**
**(Brought on behalf of Plaintiff and the Class against Defendant Sponsor)**

152.    Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

153.    At all relevant times, Plaintiff and the members of the Class, have been employees of Defendant Sponsor, and the Defendant has been their employer within the meaning of the New York Labor Law or the relevant state labor law where the Class member was required to work.

154.    Defendant has failed to pay the Plaintiff and the members of the Class compensation, including compensation for all their hours of work, and also overtime

compensation for all their hours of work that are subject to overtime regulations pursuant to the relevant state labor law where the Class member was required to work.

155.    Upon information and belief, there have been several states to date that have constitutional provisions, statutes, rules, regulations and/or other labor laws that require a payment in excess of the FLSA minimum wage.

156.    Defendant has failed to pay the Plaintiff and the members of the Class overtime wages at the rate of one and one-half times their regular rate of pay.

157.    Defendant violated Plaintiff's rights and the rights of the members of the Class, by failing to pay them for all of the hours actually worked by them as well as for overtime compensation at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of the relevant number of hours pursuant to the relevant state labor laws. Defendant's violations of the New York Labor Law or the relevant state labor laws, as described in this Complaint, have been willful and intentional.

158.    Defendant's violations of the New York Labor Law or the relevant state labor laws have caused Plaintiff and the members of the Class irreparable harm and injury.

159.    Due to Defendant's violations of the New York Labor Law or the relevant state labor laws, Plaintiff and the members of the Class are entitled to recover from Defendant their unpaid wages, as well as overtime compensation, reasonable attorney's fees, and costs and disbursement of the action, pursuant to the New York Labor Law or the relevant state labor laws.

## THIRD CAUSE OF ACTION
### Non-Payment of Minimum Wage under the FLSA
### (Brought on behalf of Plaintiff against Defendant Spouses)

160.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

161.    Defendant Spouses have engaged in a widespread pattern, policy and practice of violating the FLSA, as detailed in this Complaint.

162.    At all times relevant, Plaintiff was employed by Defendants who were engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq*.

163.    At all times relevant, Plaintiff was or has been an employee of the Defendants within the meaning of 29 U.S.C. §§ 201 *et seq*. She performed more than *au pair* childcare services, and clearly performed more domestic housekeeping duties and responsibilities.

164.    At all times relevant, Defendants have been employers of Plaintiff, engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq*.

165.    As such, Plaintiff is entitled to protection under the FLSA's minimum wage provisions.

166.    Defendants failed to pay Plaintiff at the applicable minimum hourly rate, in violation of 29 U.S.C. § 206(a).

167.    Defendants' failure to pay Plaintiff at the applicable minimum hourly rate was willful within the meaning of 29 U.S.C. § 255(a). Defendants were aware or should have been aware that the practices described in this Complaint were unlawful.  Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of the Plaintiff.

168.    As a result of Defendants' willful violations of the FLSA, Plaintiff has suffered damages by being denied minimum wage compensation in an amount to be determined at trial, and is entitled to recovery of such amount, liquidated damages, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et seq*.

**FOURTH CAUSE OF ACTION**
**Non-Payment of Minimum and Overtime Pay under the NYLL**
**(Brought on behalf of Plaintiff against Defendant Spouses)**

169.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

170.   The minimum wage provisions of Article 19 of the New York Labor Law ("NYLL") and the supporting New York State Department of Labor Regulations apply to Defendants, and protect the Plaintiff.

171.   Defendants failed to pay Plaintiff the minimum hourly wages to which she was entitled under the NYLL and the supporting New York State Department of Labor Regulations.

172.   Pursuant to the NYLL, Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor Regulations, Defendants were required to pay Plaintiff the full minimum wage at a rate of $9.70 per hour for all hours worked from October 25, 2017 through December 30, 2017; the minimum wage rate of $10.40 per hour for all hours worked from December 31, 2017 through December 30, 2018; and the minimum wage rate of $11.10 per hour for all hours worked from December 31, 2018 through November 1, 2019.

173.   Through their knowing or intentional failure to pay minimum hourly wages to the Plaintiff, Defendants willfully violated the NYLL, Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor Regulations.

174.   Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover from Defendants her unpaid minimum wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees, costs, and pre-judgment and post-judgment interest.

175.   Defendants did not also pay Plaintiff the proper overtime wages for all the time that she was suffered or permitted to work more than forty four (44) hours each workweek.

176. During her employment, Plaintiff generally and consistently worked an average of between seventy two (72) and seventy five (75) hours per week from October 25, 2017 through June 2018.

177. During her employment, Plaintiff generally and consistently worked an average of between sixty (60) and sixty five (65) hours per week from July 2018 through the third week of April 2019.

178. During her employment, Plaintiff generally and consistently worked an average of fifty (50) hours per week from the fourth week of April 2019 through November 1, 2019.

179. During such workweeks, Defendants did not compensate Plaintiff at time and a half the regular wage rate for all of the overtime hours she worked.

180. The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants, and protect Plaintiff.

181. Defendants failed to pay Plaintiff the premium overtime wages to which she was entitled under the NYLL and the supporting New York State Department of Labor Regulations for all hours worked beyond 44 hours per workweek.

182. Defendants failed to keep, make, preserve, maintain and furnish accurate records of time worked by the Plaintiff.

183. Through their knowing or intentional failure to pay Plaintiff overtime wages for hours worked in excess of 44 hours per workweek, Defendants willfully violated the NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

184. Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover from Defendants her unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest.

### FIFTH CAUSE OF ACTION
**Trafficking Victims Protection Act of 2003 ("TVPA"), as amended**
**Forced Labor, 18 U.S.C. §1589**
**(Brought on behalf of Plaintiff against All Defendants)**

185.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

186.    Plaintiff brings this claim against all Defendants.

187.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

188.    Defendants subjected Plaintiff to forced labor in violation of 18 U.S.C. §1589.

189.    Defendants knowingly obtained Plaintiff's labor and services by subjecting Plaintiff to threats of serious harm, including cancellation of and/or loss of J-1 immigration status, in violation of 18 U.S.C. §1589(2).

190.    By threatening Plaintiff with cancellation of and/or loss of her J-1 immigration status, Defendants obtained the labor of Plaintiff through abuse and threatened abuse of law and of the legal process, in violation of 18 U.S.C. §1589(3).

191.    Defendants caused Plaintiff to continue working and making herself available to work for Defendants without proper wages and in violation of J-1 visa regulations, by threatening her with cancellation of and/or loss of her J-1 immigration status.

192.    Defendants knowingly obtained Plaintiff's labor and services by using a scheme, plan and pattern intended to cause Plaintiff to believe that, if she did not continue working for the Defendants, she would suffer serious harm, in violation of 18 U.S.C. §1589(4).

193.    As a result of the above violations, Plaintiff suffered damages.

194.    Plaintiff is entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## SIXTH CAUSE OF ACTION
### Violation of NYLL Spread-of-Hours Pay
### (Brought on behalf of Plaintiff against Defendant Spouses)

195.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

196.    Defendants failed to pay Plaintiff additional compensation of one hour's pay at the basic minimum hourly wage rate for each day that the length of the interval between the beginning and end of her workday -- including working time plus time off for meals plus intervals off duty -- was greater than 10 hours.

197.    Through their knowing or intentional failure to pay Plaintiff spread-of-hours pay, Defendants willfully violated the NYLL, Article 19, §§ 650 *et seq*., and the supporting New York State Department of Labor Regulations.

198.    Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover from Defendants her unpaid spread-of-hours wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees, costs and pre-judgment and post-judgment interest.

## SEVENTH CAUSE OF ACTION
### Failure to Provide Proper Wage Notice under NYLL Art. 6, § 195(1)
### (Brought on behalf of Plaintiff against Defendant Spouses)

199.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

200.    Defendants willfully failed to furnish Plaintiff with wage notice as required by NYLL, Article 6, § 195(1), in English or in the language identified by Plaintiff as her primary language, at the time of hiring, with the notice containing:  the rate of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the

regular pay day designated by the employer in accordance with NYLL, Article 6, § 191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the Commissioner deems material and necessary.

201.    Through their knowing or intentional failure to provide Plaintiff with the wage notice required by the NYLL, Defendants willfully violated NYLL, Article 6, §§ 190 *et seq*., and the supporting New York State Department of Labor Regulations.

202.    Due to Defendants' willful violations of NYLL, Article 6, § 195(1), Plaintiff is entitled to statutory penalty of fifty dollars ($50.00) for each day that Defendants failed to provide Plaintiff with wage notice, not to exceed a total of five thousand dollars ($5,000.00), plus reasonable attorney's fees, and costs, as provided for by NYLL, Article 6, § 198(1-b).

### EIGHTH CAUSE OF ACTION
**Failure to Provide Proper Wage Statements under NYLL Art. 6, § 195(3)**
**(Brought on behalf of Plaintiff against Defendant Spouses)**

203.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

204.    Defendants willfully failed to furnish Plaintiff with statements with every payment of wages as required by NYLL, Article 6, § 195(3), listing:  the dates of work covered by that payment of wage; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; and the number of regular and overtime hours worked.

205.    Through their knowing or intentional failure to provide Plaintiff with the accurate wage statements required by the NYLL, Defendants willfully violated the NYLL, Article 6, §§ 190 *et seq*., and the supporting New York State Department of Labor Regulations.

206.    Due to Defendants' willful violations of the NYLL, Article 6, § 195(3), Plaintiff is entitled to statutory penalty of two hundred fifty dollars ($250.00) for each workweek that Defendants failed to provide Plaintiff with accurate wage statements, not to exceed a total of five thousand dollars ($5,000.00), plus reasonable attorney's fees, and costs, as provided for by the NYLL, Article 6, § 198(1-d).

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, on behalf of herself and all other similarly-situated FLSA Collective members and members of the Class, respectfully requests that this Court grant the following relief:

(a)    Prompt issuance of notice pursuant to 29 U.S.C. §216(b) to all similarly-situated members of an FLSA Opt-In Collective, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. §216(b), and appointing Plaintiff and her counsel to represent the FLSA Collective;

(b)    Certification of the State wage-and-hour causes of actions as a class action pursuant to Fed.R.Civ.P 23(b)(2) and (3) on behalf of the members of the Class, and appointing Plaintiff and her counsel to represent the Class;

(c)    Against Defendant Great Au Pair, LLC, awarding Plaintiff and members of the Collective and of the Class compensatory and liquidated damages for failure to pay the correct minimum and/or overtime wages and for failure to pay all of their employees' hours of

work, in violation of the Fair Labor Standards Act and/or the New York/relevant state labor laws;

(d)    Against all Defendants, jointly and severally, awarding Plaintiff compensatory and liquidated damages for failure to pay the correct minimum and overtime wages and for failure to pay all of Plaintiff's hours of work, in violation of the Fair Labor Standards Act and the New York Labor Law;

(e)    Against all Defendants, jointly and severally, awarding Plaintiff compensatory, punitive and emotional distress damages for violations of the Trafficking Victims Protection Act, as amended;

(f)    Against Defendant Spouses, awarding Plaintiff compensatory and liquidated damages for unpaid spread-of-hours pay, pursuant to the NYLL and the supporting New York State Department of Labor Regulations;

(g)    Against Defendant Spouses, awarding Plaintiff the maximum amount of five thousand dollars ($5,000.00) as and by way of statutory penalty, pursuant to NYLL, Article 6, § 198(1-b);

(h)    Against Defendant Spouses, awarding Plaintiff the maximum amount of five thousand dollars ($5,000.00) as and by way of statutory penalty, pursuant to NYLL, Article 6, § 198(1-d);

(i)    An award of prejudgment and post-judgment interests;

(j)    An award of costs and expenses of this action, together with reasonable attorneys' fees;

(k)    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a jury trial in this matter on all issues of fact raised by the Complaint.

Respectfully submitted.
August 18, 2020. Woodside, New York.

Yours, etc.

LAW OFFICE OF FELIX VINLUAN

By:    */s/ Felix Q. Vinluan*
       FELIX Q. VINLUAN (FV6788)
       6910 Roosevelt Ave., 2nd Floor
       Woodside, NY 11377
       Tel. No. 718-478-4488
       Fax No. 718-478-4588
       Email: fqvinluan@yahoo.com

LAW OFFICES OF MANUEL QUINTAL, PC

By:    */s/ Manuel B. Quintal*
       MANUEL B. QUINTAL (MQ5186)
       291 Broadway, Suite 1501
       New York, NY 10007
       Tel. No. 212-732-0055
       Fax No. 212-587-8933
       Email: quintallaw@aol.com

*Attorneys for the Plaintiff*

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF QUEENS    ) S.S.

    I, MARIETA P. BESERA, of legal age, and presently residing in Hudson County, State of New Jersey, after having been sworn in accordance with law, hereby state that I am the Plaintiff in the within Complaint.  I have read the foregoing Complaint and know the contents thereof.  The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                        _____
                                        MARIETA P. BESERA

SUBSCRIBED AND SWORN to before me this 18th day of August 2020.

                            Notary Public _____

                                FELIX Q. VINLUAN
                         Notary Public, State of New York
                             No. 02VI6129101
                         Qualified in Nassau County
                  Commission Expires June 20, 2021